UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOREEN ANN BURNS,<br><br>        Plaintiff,<br><br>   v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>        Defendant. | No. 1:18-cv-01485-GSA<br><br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

I.    <u>**Introduction**</u>

Plaintiff Doreen Ann Burns ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 15, 18 and 19.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 9 and 16.

II.   **Procedural Background**

On October 10, 2014, Plaintiff filed an application for supplemental security income alleging disability beginning September 15, 2011.  AR 20.  The Commissioner denied the application initially on March 16, 2015, and following reconsideration on July 22, 2015.  AR 20.

On July 31, 2015, Plaintiff filed a request for a hearing.  AR 20.  Administrative Law Judge Sheila Walters presided over an administrative hearing held on May 4, 2017.  AR 38-79.  Plaintiff appeared and was represented by an attorney.  AR 38.  On October 4, 2017, the ALJ denied Plaintiff's application.  AR 20-32.

The Appeals Council denied review on August 22, 2018.  AR 1-7.  On October 25, 2018, Plaintiff filed a complaint in this Court.  Doc. 1.

III.   **Factual Background**

A.   **Plaintiff's Testimony**

Plaintiff (born 1965) lived alone.  AR 46.  She attended school through the eleventh grade and later trained as a certified nursing assistant.  AR 47, 48.  Her driver's license was suspended for failure to pay child support.  AR 46.  Her daily activities were severely limited for lack of funds.  AR 50.

Plaintiff's only past relevant employment was several caregiver jobs which she performed for about six months in 2012.  AR 52.  Due to her spinal problems Plaintiff never took jobs that required lifting or carrying, and generally worked at night when her patients were sleeping.  AR 53.  Plaintiff stopped working because she was sad and physically exhausted.  AR 55, 69.  She complained of constant pain, and alleged brain injury and memory problems attributable to her having been abused as a child.[2]  AR 56, 70.

B.   **Learning Evaluation**

At Plaintiff's request, on January 2010, educational therapist Lloyd Schneider, M.A., evaluated Plaintiff for a suspected learning disability.[3]  AR 297-305.  Mr. Schneider characterized

---

[2] Plaintiff testified to many physical and mental ailments. In response to the ALJ's queries, Plaintiff's attorney admitted that he had seen no medical documentation of many of the impairments to which Plaintiff testified.  *See, e.g.,* AR 58, 59.  The attorney provided the ALJ with a copy of a list of impairments that Plaintiff brought with her to the hearing.  AR 61.

[3] The record does not explain why Plaintiff retained Mr. Schneider to conduct the study.

Plaintiff as "learning different" or "learning disabled." AR 300. She had a "switching issue" and visual difficulties possibly associated with a traumatic brain injury. AR 300. She had significant difficulties in math and oral expression. AR 300. Mr. Schneider recommended (1) examination by a visual specialist; (2) a neurological consultation; (3) use of peer notes in lecture classes; (4) use of a calculator in educational or work place settings where accurate math was required; (5) use of a word processor with spell check when correct spelling is required; and, (6) provision of extra time in a distraction-free environment for all testing. AR 302.

### C. Medical Records

#### 1. Physical Impairments

**Back pain.** In September 2013, Plaintiff received a Toradol shot for back pain at the SRMC urgent care center. AR 357. From November 2013 through May 2014,Wais M. Tarrar, M.D., treated Plaintiff for chronic low back pain, chronic pain syndrome and continuous opioid dependence. AR 458-512, 527-35. Magnetic resonance imaging of Plaintiff's lumbar spine in October 2013 revealed mild/moderate spinal stenosis at L2-3; mild/moderate foraminal narrowing at L3-4; a tiny foraminal protrusion at L5-S1; and, prominent edema deep in the endplates of L5-S1 indicating active discogenic process. AR 373-74. In February 2014, Plaintiff requested a referral for an epidural injection. AR 479. In April 2014, Dr. Tarrar treated Plaintiff for acute neck pain and left arm numbness. AR 465. In April 2016, Karen Brasesco, PT, evaluated Plaintiff to begin physical therapy for low back pain. AR 590-92.

**Respiratory Problems.** In October 2014, Plaintiff visited the Sonora Regional Medical Center (SRMC) emergency department multiple times for treatment of acute bronchitis and pleurisy. AR 307, 313. Chest x-rays showed no infiltrates, masses or signs of pneumonia. AR 311. Upon initial treatment on October 18, 2014, Plaintiff had already begun treating herself with prednisone left over from a prior illness. AR 313, 318. Chest x-rays were within normal limits. AR 361. When Plaintiff returned to the emergency department later the same day complaining of continued shortness of breath, she had not yet filled her prescriptions from the morning visit but wanted staff to again provide the nebulizer treatment that had helped her that morning. AR 313.

///

On October 28, 2014, Plaintiff had full oxygen saturation with no wheezing or rhonchi. AR 311-12. X-rays were again negative. AR 360. Staff advised Plaintiff that the medications prescribed on October 18 would remain in her system to prevent pneumonia even though coughing and accompanying chest discomfort from bronchitis may last as long as six weeks. AR 312. Plaintiff left the emergency department before discharge. AR 311.

After conducting pulmonary testing in February 2015, John Frederick Shield, M.D., reported that Plaintiff had "a mild obstructive defect with significant improvement post bronchodilator therapy." AR 561-64. The test results could indicate either asthma or COPD. AR 561.

In June 2015, Artin Mahmoudi, M.D., began an initial evaluation of Plaintiff's obstructive pulmonary problems. AR 712. Dr. Mahmoudi prescribed a Symbicort inhaler and montelukost, and referred Plaintiff for further testing. AR 719. In September 2015, Dr. Mahmoudi noted that Plaintiff's breathing difficulty largely reflected stress, anxiety and emotional issues. AR 741.

In January 2016, Plaintiff was treated in the emergency department for shortness of breath. AR 641-46. In February 2016, Plaintiff told Dr. Mahmoudi that she was experiencing two daytime and two nighttime asthma attacks per week. AR 809. Dr. Mahmoudi reiterated that Plaintiff's lung studies were consistently normal, again attributing the asthma attacks to anxiety and depression. AR 815. Dr. Mahmoudi also questioned whether GERD was resulting in chronic aspiration. AR 815.

In December 2016, Plaintiff was ostensibly hospitalized for five days with bilateral pneumonia.[4] AR 704. In January 2017, Plaintiff was treated in the emergency department on two occasions for shortness of breath.[5] AR 662-69.

In April 2017, Dr. Mahmoudi noted that Plaintiff's asthma was poorly documented. AR 754. Plaintiff used rescue medications daily and reported asthma attacks all day but none at night. AR 754. She had a "TON of ER visits for various issues and complaints but ha[d] not

---

[4] The administrative record includes no medical records of Plaintiff's being hospitalized for pneumonia; however, the hospitalization is referred in several physician's treatment notes thereafter. The Court cannot determine whether Plaintiff's doctors independently knew of Plaintiff's hospitalization or relied on her representations.
[5] Note that on this occasion, as on many subsequent visits to the SRMC emergency department, Plaintiff failed to follow up with a physician following discharge.

been hospitalized nor ha[d] she taken any steroids." AR 754. Dr. Mahmoudi again noted that Plaintiff's psychiatric problems complicated her care. AR 754.

**Abdominal pain and digestive issues.** In July 2013, Plaintiff was treated in the SRMC emergency department for abdominal pain. AR 358-59. Following an abdominal scan that revealed two small kidney stones, the emergency physician prescribed hydrocodone and directed Plaintiff to strain her urine and follow up with her personal physician. AR 358-59, 375-78. D. Scott Klatt, M.D., treated Plaintiff for kidney stones in July and September 2013. AR 352, 376, 377. In October 2013, following another emergency treatment, Dr. Tarrar conducted a follow-up appointment concerning Plaintiff's kidney stones. AR 522.

In November 2013, urologist Timothy R. Moreno, M.D., inserted a kidney stent to relieve a left mid-ureteral calculus with blockage. AR 339-40. Later that month, Plaintiff sought treatment for abdominal pain in the SRMC emergency department. AR 334-38. After reviewing x-rays showing that the stent remained in place and discussing the matter with Dr. Moreno, David Weinreb, M.D., referred Plaintiff to Dr. Moreno for further treatment including consideration of pain medication. AR 338.

In May 2014, an abdominal ultrasound administered in response to Plaintiff's pelvic pain was unremarkable. AR 364. In May and June 2014, Plaintiff had appointments with both Matthew T. Maynard, M.D.,[6] and Tony H. Tran, M.D., to monitor her pelvic pain and medications. AR 437-49.

In May 2016, Plaintiff was seen in the SRMC emergency department with "multiple vague complaints." AR 635-40. An examination was unremarkable except for elevated blood pressure. AR 639-40. Krysta Wolken, N.P., diagnosed chronic epigastric pain, GERD and nausea. AR 640. Plaintiff was discharged with prescriptions for Bentyl and Zotran and directed to keep an upcoming medical appointment. AR 640.

In December 2016, Brian J. Carlson, M.D., examined Plaintiff for complaints of acid reflux. AR 770. Plaintiff had recently been discharged from SRMC following treatment for

---

[6] Dr. Maynard was Plaintiff's gynecologist. AR 792. He noted that he provided renewals of prescriptions issued by primary care physicians who had left the area or discharged Plaintiff from their practices. AR 789.

pneumonia which Plaintiff reported may have been attributable to aspiration. AR 770. Plaintiff told Dr. Carlson that her reflux was complicated by the "handful" of pills she took at bedtime for her PTSD. AR 770.

In January 2017, Rodney Eddi, M.D., performed a colonoscopy and an upper gastrointestinal endoscopy. AR 670-73. The colonoscopy was normal except for small-mouth diverticula in the sigmoid colon, the descending colon and the ascending colon. AR 670-71. The endoscopy revealed esophagitis, gastritis and z-line irregularities. AR 673. In February 2017, Dr. Eddi secured additional biopsy specimens to rule out gastroesophageal dysplasia. AR 876.

Plaintiff again had kidney stones in March 2017. AR 785.

**Brain injury.** In July 2013, Gregory J. Schaner, M.D., performed an unremarkable CT brain scan. AR 379. A second brain scan in March 2014 showed no acute lesion or mass but revealed two small nonspecific areas of focal signal abnormality in the left frontal and parietal convexity. AR 365. The areas were of uncertain relevance and were not addressed medically. AR 365.

An MRI study in October 2016 indicated that the nonspecific subcortical white matter foci remained unchanged. AR 831. Except for evidence of left maxillary sinus disease, the study was otherwise normal. AR 831-32.

**Left heel pain.** In August 2014, Dr. Tran treated Plaintiff for foot problems including bilateral swelling, recurrent bruising of the right foot and pain in the left heel. AR 426. X-rays of Plaintiff's left heel revealed a small calcaneal spur. AR 363, 536. Dr. Tran recommended that Plaintiff wear well-padded shoes with good arch support. AR 432. In September 2014, John Krpan, O.D., directed Plaintiff to use shoe insert pads to relieve pressure on the bone spur. AR 423. In October 2014, podiatrist Steven Jensen, D.P.M., examined Plaintiff, who sought surgery for the heel spur. AR 400-02. Dr. Jensen diagnosed plantar fasciitis, injected a local anesthetic, and recommended stretching exercises and supportive shoes. AR 402.

To alleviate her left foot pain, Plaintiff attended six sessions of physical therapy in January and February 2015. AR 565-577. In early March 2015, Plaintiff cancelled all remaining

therapy, reporting that she had a cast on her foot.[7]  AR 567.  Plaintiff returned for physical therapy for her left foot in August and November 2015.  AR 647-59.  In both August and November, the record includes no documentation of therapy following the initial interview.

At a periodic general examination in May 2015, Plaintiff complained of left foot numbness, which she described as her worst pain.  AR 699.  Lorretta O'Brian, M.D., referred Plaintiff to neurology.  AR 699.

In July 2015, Dr. Jensen noted that Plaintiff's heel pain had become remarkable for its intractable nature, and due to recent nerve conduction studies indicating some lower extremity pathology.  AR 775.  Plaintiff had developed tremors and used a wheelchair.  AR 775.  On examination, Dr. Jensen observed mild swelling, intact sensation, and moderate tenderness on direct and side pressure.  AR 775.  Dr. Jensen prescribed tramadol for pain management.  AR 776.

**Shoulder pain.**  In September 2014, Wendy Wicke, PA-C, referred Plaintiff for physical therapy to address Plaintiff's complaints of shoulder pain and muscle spasm.  AR 327, 332.  Plaintiff was also examined by Dr. Krpan.  AR 408-24.  About a week later, Plaintiff went to the SRMC emergency department complaining of intolerable shoulder pain and requesting medication stronger than the Vicodin she was then taking.  AR 324.  Plaintiff told emergency department staff that her physical therapist has diagnosed a torn rotator cuff.  AR 324.  She was reluctant to provide medical history, claiming it was irrelevant.  AR 324. Although Plaintiff had a sling at home she refused to wear it "until she f[ound] out what [wa]s wrong."  AR 324.  X-ray studies were normal, and examination revealed only mild tenderness and a full range of shoulder motion.  AR 324-36, 362.  Plaintiff was treated with a Toradol injection and ice packs and directed to use Tylenol at home and to consult an orthopedist.  AR 326.  By the time of Plaintiff's initial orthopedic appointment in October 2014, Plaintiff's shoulder problems had resolved.  AR 392-96, 748.

///

///

---

[7] The record includes no documentation of foot surgery or an accidental injury,

**Jaw pain.** In May 2014, Dr. Tarrar examined Plaintiff regarding complaints of jaw pain. AR 451-57. Noting that Plaintiff had reported prior episodes of TMJ malfunction, Dr. Tarrar referred Plaintiff to a maxillofacial surgeon. AR 451.

**Knee pain.** In December 2016, Plaintiff was reportedly hospitalized with pneumonia. In the same month, Plaintiff had several falls that she attributed to dizziness. AR 704. In January 2017, Kenneth K. Renwick, M.D., noted that Plaintiff injured both knees in the course of her falls. AR 704. Although Plaintiff had not followed up with an orthopedist after three emergency department visits, she complained of persistent swelling, weakness and pain. AR 767. Dr. Renwick prescribed crutches and referred Plaintiff to an orthopedist to investigate a possible meniscal tear. AR 768. Dr. Krpan noted that MRI studies had revealed a meniscal tear in each knee. AR 819, 827-30. In April 2017, Plaintiff underwent arthroscopic surgery to repair meniscal tears in her right knee. AR 743.

**Chronic pain and opiate use.** Urine tests in May 2015 were negative for Soma and Norco but positive for Elavil. AR 777. In June 2015, Plaintiff advised Dr. Krpan that she had discontinued all opiate painkillers. AR 748. In tests at the emergency room in early July 2015, Plaintiff tested positive for benzodiazepine and amphetamine. AR 777.

In July 2015, Janet Jean Briggs, D.O., saw Plaintiff at an appointment to follow up on an emergency room visit for diarrhea, vomiting and fever. AR 777. Plaintiff complained of pain behind both ears, like pulsating lightning bolts, that caused her nausea and vomiting. AR 777. Plaintiff reported that Tramadol did not relieve the pain and requested Soma and promethazine. AR 777.

In October 2015, Dr. Maynard refilled Plaintiff's prescriptions for Tramadol and Soma. AR 803.

In February 2016, Plaintiff was walking well with a cane despite chronic pain. AR 746. Dr. Maynard prescribed Prilosec, Ultram, trazodone, Prozac and gabapentin. AR 747.

///

///

///

8

In March 2016, Dr. Maynard diagnosed PTSD, chronic pain and insomnia. AR 709. Plaintiff was taking Ultram[8] for chronic pain and trazodone[9] to sleep. AR 709. In March 2016, Dr. Maynard noted that Plaintiff needed a pain management consultation to address her chronic pain and continuing Ultram use. AR 710.

In March 2016, Plaintiff moved to a "clean and sober" living facility. AR 589.

Plaintiff saw Thomas James King, N.P., for integrated pain management monitoring. AR 720, 732, 793. At a pain management appointment in May 2016, Mr. King noted difficulty in obtaining an average pain level from Plaintiff with cognitive impairment. AR 816. In the same month, Dr. Maynard renewed Plaintiff's prescription for Ultram. AR 781.

Urine screens performed in June 2016 revealed none of Plaintiff's prescribed medications, indicating that she was not taking them correctly. AR 732. In July 2016, Mr. King noted that in two weeks, Plaintiff used opiates intended to last one month. AR 720. Claiming that she was unable to monitor her medications Plaintiff requested a referral for addiction treatment. AR 720.

In September 2016, Dr. Maynard noted that Plaintiff had not used most pain medications for three to six months but was occasionally experiencing discomfort and headache pain. AR 723. Plaintiff was using over-the-counter medications for sleeping. AR 723. Dr. Maynard prescribed a ninety-day supply of tramadol and temazepam. AR 724.

Also in September 2016, Dr. Renwick noted that the buprenorphine patch was relieving neuropathy in Plaintiff's lower extremities as well as shoulder and neck pain. AR 751. Dr. Renwick noted a wobbly gait and significant shakiness. AR 751.

In October 2016, Plaintiff asked Dr. Renwick to increase the dosage of her buprenorphine patches. AR 764. Plaintiff had delayed her return appointment and was "out of most if not all of her medication." AR 746. Plaintiff had a long-term history of sciatica-like pain with pain and numbness to her feet bilaterally, which she attributed to a bone spur near her coccyx. AR 746. She was taking both Lyrica and gabapentin for the neuropathic pain in her legs but denied ever having had EMG testing. AR 746.

---

[8] Ultram (tramadol) is an opiate medication prescribed to treat moderate to severe long-term pain. It is highly addictive, particularly with long-term use. www.medlineplus.gov/meds/a695011,html (accessed March 26, 2020).
[9] Trazodone is an antidepressant. www.medlineplus.gov/meds/a681038,html (accessed March 26, 2020).

In November 2016, Plaintiff reported left-sided pain, particularly in her left elbow and left hip to knee. AR 804. Dr. Renwick continued prescriptions for buprenorphine and pregabalin. AR 805.

As of December 2016, Dr. Maynard was still refilling Plaintiff's prescriptions for Ultram and Trazodone. AR 707.

In January 2017, Dr. Renwick diagnosed opiate misuse. AR 705. Dr. Renwick recommended that Plaintiff not fill a prescription for Percocet given to her by the emergency department for knee pain. AR 705. Plaintiff was still using a buprenorphine patch.[10] AR 705.

In February 26, 2017, Plaintiff presented to the SRMC emergency department reporting an acute exacerbation of chronic pain including headache, abdominal pain and back pain. AR 869. Personnel noted that Plaintiff was a poor historian and confused. AR 869. She could not explain the etiology or onset of her pain. AR 869. She reported that she no longer had a buprenorphine patch and didn't know when the patch was discontinued. AR 869. However, emergency department records showed that a patch was on Plaintiff's left arm during an emergency department visit on February 20, 2017, and that Plaintiff had received a prescription for four seven-day patches on February 6, 2017. AR 869. On February 16, 2017, she had received a prescription for 90 doses of alprazolam. AR 869. A drug screen was negative for opiates but positive for benzodiazepines. AR 874.

In March 2017, Dr. Maynard noted that Plaintiff had discontinued some prescription medications and was taking others irregularly. AR 785.

In April 2017, Plaintiff suddenly discontinued all medications. AR 783. Plaintiff later told Dr. Renwick that she had no one to monitor her at home and she feared she would overdose. AR 783. As a result, Plaintiff went into withdrawal and decompensated, requiring emergency department treatment. AR 783. While there, she became frustrated and hysterical and was transferred for mental health treatment. AR 783. On examination, Dr. Renwick observed shaky tremor-like movements. AR 783. Plaintiff complained of dreams and nightmares. AR 783. Dr.

---

[10] A buprenorphine transdermal patch is an opiate medication prescribed for persons expected to require pain relief around the clock for a prolonged period. www.medlineplus.gov/druginfo/meds/a613042.html (accessed March 25, 2020).

Renwick noted difficulties in selecting medications due to Plaintiff's drug abuse history, which precluded prescription of amphetamines and "benzos" or other sedative hypnotics. AR 783.

## 2. Mental Health Treatment

On November 1, 2014, psychologist Susan Day, Ph.D., provided a letter summarizing her treatment of Plaintiff.[11] AR 548-49. In August 2011, following an instance of domestic abuse, Dr. Day began treating Plaintiff in weekly and biweekly therapy sessions that included cognitive behavioral therapy, psychoeducational therapy and psychodynamic/imaginal approaches. AR 548-49. Plaintiff continued therapy as long as the California Victims Compensation and Government Claims Board approved her treatment. AR 549.

Dr. Day diagnosed chronic PTSD and moderate-to-severe major depression. AR 549. Symptoms included intrusive thoughts and images related to traumatic events; physiologic reactivity to internal and external events similar to the traumatic abuse; pessimistic and fatalistic thought s about the future; and, depression. AR 548. The symptoms of PTSD and depression were sufficiently severe to impair Plaintiff's return to work. AR 549.

In March 2015, Dr. Day's partner, Galyn M. Savage, Ph.D., noted that Plaintiff had borderline personality disorder. AR 777.

Following a periodic general examination in May 2015, Dr. Maynard suggested prescription medication (SSRI) for depression. AR 698. Plaintiff declined. AR 698.

In June 2015, Dr. Savage tested Plaintiff for ADHD. AR 585-87. Testing indicated that Plaintiff's verbal comprehension and processing speed were in the average range; perceptual reasoning was low average; and, working memory was borderline. AR 587. The scores were consistent with ADHD. AR 587. Dr. Savage counseled Plaintiff on coping with adult ADHD. AR 587.

In March 2016, Dr. Day's partner, Anthony Scheving, Psy.D., issued a letter stating that that Plaintiff had 68 visits to the practice since 2011. AR 588.

///

///

---

[11] The record includes no treatment records from Dr. Day.

At various times, Plaintiff also took antidepressants and antianxiety drugs prescribed by physicians providing her medical care. *See, e.g.,* AR 710 (Paxil), 746 (Paxil), 784 (Xanax), 789 (Paxil).

In October 2016, Dr. Renwick noted that Plaintiff lacked a primary care physician, having been discharged from several practices as difficult to deal with. AR 746. Plaintiff denied that the discharges were her fault explaining that the doctors got frustrated when asked to refill prescriptions originally issued by other doctors. AR 746.

In January 2017, Dr. Renwick noted that Plaintiff's persistent complaining suggested a personality disorder and might explain why Plaintiff was repeatedly discharged from primary care practices. AR 768.

## IV. <u>Standard of Review</u>

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was

///

inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.     Summary of the ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of October 10, 2014. AR 22. Her severe impairments included: obesity; degenerative disc disease of the lumbar spine; chronic obstructive pulmonary disease; (COPD); asthma; depressive disorder; anxiety disorder; post-traumatic stress disorder (PTSD); borderline personality disorder; attention deficit hyperactivity disorder; and, dyslexia/learning disorder. AR

13

22-23  None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).  AR 24-26.

The ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b).  AR 26.  Plaintiff was able to lift and/or carry ten pounds frequently and twenty pounds occasionally; sit, stand and/or walk for six hours in an eight-hour workday; frequently climb ramps and stairs; and, occasionally balance, stoop, kneel, crouch and crawl.  AR 26.  She was precluded from climbing ladders, ropes and scaffolds, and working around hazards including unprotected heights and dangerous moving machinery.  AR 26. She needed to avoid concentrated exposure to pulmonary irritants including fumes, odors, dusts, smoke, gases and poor ventilation.  AR 26.  She was limited to simple, routine and repetitive tasks with no more than occasional interactions with supervisors, coworkers and the public.  AR 26.

Plaintiff was able to perform her past relevant work as a caregiver.  AR 30.  Accordingly, the ALJ found that Plaintiff was not disabled at any time from October 10, 2014, the application date, through October 4, 2017, the date of the decision.  AR 32.

**VII.    Reliability of Plaintiff's Symptom Testimony**

As part of her issue contending that the ALJ failed to determine residual functional capacity in accordance with the nature and intensity of her limitations, Plaintiff contends that the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's subjective testimony. The Commissioner does not directly address this contention.

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by "clear and convincing evidence."  *Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014).

To determine whether the ALJ's findings are supported by sufficient evidence a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

1989). "[A] federal court's review of Social Security determinations is quite limited." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). "For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014), quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 621 (1966)) (internal quotation marks omitted). Federal courts should generally "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler.*, 775 F.3d at 1098).

A claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). This is particularly true when claimants demonstrate drug-seeking behavior as evidenced by the claimant's behavior in hospitals or doctors' appointments, a history of drug addiction or the strength of narcotics used by the claimant. *Lewis v. Astrue*, 498 F.3d 909, 910 (9th Cir. 2007).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 27. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent

15

to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2. "[S]ome individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence and the same non-medical evidence." S.S.R. 16-3p at 5. In reaching a conclusion, the ALJ must examine the record as a whole, including objective medical evidence, the claimant's representations of the intensity, persistence and limiting effects of her symptoms, statements and other information from medical providers and other third parties and any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p at *10.

Because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (9th Cir. 2001) (quoting *Fair*, 885 F.2d at 602 (9th Cir. 1989)). *See also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* (internal quotation marks omitted).

The law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of his or her analysis of the record as a whole, an ALJ properly

16

considers whether the objective medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence").

The ALJ's analysis of the reliability of Plaintiff's testimony began in the determination of Plaintiff's severe impairments at step two. In that discussion, the ALJ rejected Plaintiff's claims of traumatic brain injury dating to her having been physically abused as a child by her parents, and as an adult by a former boyfriend. AR 23. The ALJ found that imaging studies did not support the claim of brain damage since they were generally normal except for two small areas of signal anomaly that Plaintiff's physicians deemed inconsistent with demyelination. AR 23. Further, no evidence supported Plaintiff's claims of functional impairment due to brain injury, including memory impairment. AR 23.

With regard to Plaintiff's essential tremor, the ALJ wrote:

> In August 2016, [Plaintiff] exhibited "significant" essential tremoring, with symmetrical and tremors and instability in walking; however, it was noted that on recheck when walking back into the clinic, she had "decreased her tremor" and had "less ataxia," suggesting the claimant was intentionally making her tremor and ataxia worse than it actually was. Nevertheless, there is no evidence that the claimant's tremoring is such that would more than minimally affect her ability to perform basic work activities.

AR 23.

The ALJ was also unpersuaded by Plaintiff's claim that the foot pain caused by plantar fibromatosis and plantar fasciitis constituted a disabling impairment. AR 23. The ALJ noted that Plaintiff's main symptom was tenderness of the left heel, but that Plaintiff generally walked with a normal gait and that treatment was conservative, consisting of physical therapy, injection therapy, stretching and supportive footwear. AR 23.

The ALJ rejected Plaintiff's claims of vascular impairments of her lower extremities and Parkinson's disease as wholly unsupported by the record. AR 24.

The analysis of Plaintiff's residual functional capacity considered Plaintiff's subjective

claims with regard to the severe impairments of Plaintiff's spine, respiratory system, obesity and mental health in light of objective medical records. AR 27-29. The ALJ began her analysis by noting imaging studies that revealed mild-to-moderate spinal stenosis, lumbar degenerative disc disease and lumbar pain. AR 27. The ALJ contrasted sporadic findings of tenderness to palpation, minimal muscle spasms, reduced range of motion, mildly reduced lower extremity strength and positive straight leg raising with Plaintiff's ability to perform usual activities prior to undergoing knee surgery just before the hearing. AR 27. Although the ALJ recognized Plaintiff's ability to do work was not unlimited, the evidence as a whole supported the finding that Plaintiff was able to independently provide her own personal care, grooming and hygiene, and perform household chores, including cleaning, without assistance. ARE 27-28. Although treatment notes sometimes reported an antalgic or wobbly gait, Plaintiff's physicians generally observed a normal gait. AR 27. Notably, Dr. Renwick reported that Plaintiff "walks more comfortably, particularly when distracted." AR 804.

The hearing decision next acknowledged Plaintiff's diagnoses of COPD and asthma with mild obstructive defect after bronchodilator therapy. AR 28. Medical records indicated that Plaintiff's lungs were generally clear to auscultation with normal breathing, and an absence of wheezing, crackling or other symptoms. AR 28. Accordingly, the ALJ concluded that Plaintiff's residual functional capacity required her to avoid concentrated exposure to pulmonary irritants. AR 28.

Finally, the hearing decision contrasted Plaintiff's normal mental status examination with her persistent subjective complaints and determined that Plaintiff was capable of simple repetitive work with limited contact with supervisors, coworkers and the public. AR 28-29.

The hearing decision sets forth abundant evidence in the record to support the ALJ's determination that Plaintiff's representations to the agency were not fully credible. The Court will not second guess the ALJ's assessment of Plaintiff's credibility.

**VIII.** <u>**Sufficient Evidence Supported the Residual Functional Capacity Determination**</u>

Plaintiff contends that the ALJ failed to provide clear and convincing reasons for

disregarding the medical source statements of Plaintiff's treating physician Dr. Day.  The

Commissioner disagrees, contending that the medical opinions as a whole, including the opinions

of Dr. Day, supported the ALJ's evaluation of the medical evidence.  The Court agrees with the

Commissioner.

## A.  Medical Opinions

### 1.  Agency Physicians and Psychologists

In December 2014, in the course of the initial agency review of Plaintiff's SSI application,

gastroenterologist C. Bullard, M.D., noted that the record included no medical documentation to

support Plaintiff's allegations of concussions, domestic violence, tremors, balance disorder, or

foot and brain problems.  AR 87.  The evidence supported findings of mild degenerative disc

disease and spinal stenosis.  AR 67.  Dr. Bullard recommended a finding of medium residual

functional capacity with respiratory restrictions.  AR 87.

In March 2015, psychologist Kim P. Morris, Psy.D., noted that Plaintiff had a history of

receiving treatment for PTSD and depression, but was not currently receiving treatment.  AR 87.

Examination indicated no symptoms of depression or PTSD.  AR 87.  Testing indicated average

intellectual functioning, low average to average academic achievement, and limitations in reading

comprehension.  AR 87.  Plaintiff was diagnosed with borderline personality disorder resulting in

moderate limitations in socialization.  AR 87.  Dr. Morris opined that Plaintiff was able to

perform simple and detailed tasks in a position that involved limited interactions with others.  AR

87.

In Dr. Morris's opinion, Plaintiff had understanding and memory limitations.  AR 92.

Nonetheless, he opined that Plaintiff had no significant limitations in the ability to remember

locations and work-like procedures; understand, remember and carry out very short and simple or

detailed instructions; maintain attention and concentration for extended periods; perform

activities within a schedule; maintain regular attendance and be punctual within customary

tolerances; make simple work-related decisions; ask simple questions or request assistance; be

aware of normal hazards and take appropriate precautions; travel to unfamiliar locations and use

public transportation; and, set realistic goals or make plans independently of others.  AR 92-93.

Plaintiff had moderate limitations in the ability to work in coordination with or in proximity to others without being distracted by them; complete a normal workday or work week without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number or length or rest periods; interact appropriately with the general public; accept instruction and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or displaying behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and, respond appropriately to changes in work setting. AR 92-93.

On reconsideration, psychologist David Tessler, Ph.D., agreed with Dr. Morris's initial opinion. AR 109-11. Dr. A. Pan, M.D., agreed with the medical portion of the determination. AR 109.

## 2. **Consultative Opinion: Psychology**

In February 2015, psychologist Michael Cohn, Ph.D., provided a comprehensive psychiatric opinion at the agency's request. AR 555-59. The evaluation was based on Dr. Cohn's interview with Plaintiff and administration on the Mini Mental Status exam. AR 555-59. The agency provided no records for Dr. Cohn's review. AR 555. Dr. Cohn diagnosed borderline personality disorder. AR 558. He observed no signs or symptoms of PTSD, depression or any psychiatric disorder other than borderline personality disorder. AR 558.

Dr. Cohn opined that Plaintiff was able to handle funds in her own best interest; understand, remember and carry out simple one- or two-step job instructions; understand, remember and carry out detailed and complex job instructions; maintain concentration, attention, persistence and pace; associate with day-to-day work activity, including attendance and safety; accept instruction from supervisors; maintain regular attendance in the work place and perform work activities on a consistent basis; and, perform work activities without special or additional supervision. AR 558-59. Because of her borderline personality disorder, Plaintiff's ability to interact with co-workers and the public was moderately impaired. AR 558.

///

///

20

///

### 3. <u>Treating Opinion: Dr. Day</u>

On June 27, 2016, Dr. Day provided a letter to whom it may concern, confirming that Plaintiff had been treated by Drs. Day, Scheving and Savage on and off since 2011.  AR 593.  Dr. Day opined:

> Ms. Burns has been diagnosed with and suffers from symptoms associated with Post Traumatic Stress Disorder and Moderate to Severe Depressive Disorder with Mixed Features.  Her symptoms include: intrusive distressing memories and dreams, flashbacks, marked physiological reactions to internal cues, avoidance of distressing thoughts, memories and feelings, irritability and angry outbursts, exaggerated negative beliefs, estrangement from others, reckless behavior, sleep disturbance, reckless behavior, feeling keyed up or tense, difficulty concentrating, fearing that something awful will happen, feeling that she might lose control, episodes of grandiosity, pressure to talk, flight of ideas, increase of energy. These symptoms have made it difficult to work consistently and to maintain relationships.

AR 593.

On July 18, 2017, Dr. Day wrote to Plaintiff's attorney, again confirming that Plaintiff had been seen in the offices of Woods Creek Psychological Group since August 2011.  In addition to her original diagnoses of PTSD and major depressive disorder, Plaintiff had also been diagnosed with borderline personality disorder.  AR 882.  After providing a general description of borderline personality disorder, Dr. Day reported that Plaintiff had received emergency room treatment on April 17, 2017 for pain, worsening depression and various other physical symptoms.  AR 883.  Dr. Day reported that Plaintiff was anxious because her physical symptoms were consistent with multiple sclerosis but she was unable to secure an appointment with her primary care physician, whose office was located within an active wildfire zone.  AR 883.  After listing Plaintiff's various symptoms, Dr. Day again opined that Plaintiff was unlikely to be able to return to work.  AR 883.

### 4. <u>Treating Opinion: Ms. West</u>

Beginning in February 2017, Plaintiff, claiming to be in crisis, made multiple walk-in attempts for services through Tuolumne County Behavioral Health Services.  AR 625-33.  Plaintiff declined medication services.  AR 628. In March 2017, Loretta West, MFT, conducted an intake interview  AR 604-22.  Ms. West diagnosed:

Axis I:      Post-traumatic stress disorder, chro
             Major depressive disorder, recurren

Axis II:     Encntr for obs for oth suspctd dises

Axis III:    [blank]

Axis IV:     Problems related to other legal circ
             Personal history of physician & sex a
             Adult sexual abuse, confirmed, initl
             Insufficient social insurance and we

Axis V:      GAF=41

AR 621-22.[12]

## B.    Determining Residual Functional Capacity

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p.  The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments.  SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews*, 53 F.3d at 1039-40.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are

---

[12] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 41-50 corresponds to serious symptoms or a serious impairment in social, occupational, or school functioning. *Id*.

reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen*, 80 F.3d at 1285. The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

**C.      The ALJ Properly Analyzed Evidence in the Record as a Whole**

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. He or she properly determines the weight to be given each medical opinion by considering the evidence in the record as the ALJ did here. 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight

we will give to that opinion").  The record must include objective evidence to support the medical opinion of the claimant's residual functional capacity.  *Meanel v. Apfel*, 172 F.3d 1111, 1113-14 (9th Cir. 1999).  Inconsistencies with the overall record or with a physician's own notes are a valid basis to reject a medical opinion. *Molina v. Astrue*, 674 F.3d 1104, 1111-1112 (9th Cir. 2012) (recognizing that a conflict with treatment notes is a germane reason to reject a treating physician's assistant's opinion); *Connett v. Barnhart,* 340 F.3d 871, 875 (9th Cir. 2003) (rejecting physician's opinion when treatment notes provide no basis for the opined functional restrictions); *Tommasetti*, 533 F.3d at 1041 (incongruity between questionnaire responses and the Plaintiff's medical records is a specific and legitimate reason for rejecting an opinion); *Valentine v. Comm'r of Soc. Sec. Admin*., 574 F.3d 685, 692-693 (9th Cir. 2009) (holding that a conflict with treatment notes is a specific and legitimate reason to reject a treating physician's opinion).

The Court is not required to accept Plaintiff's characterization of her treatment records or her assessment of her medical opinions.  The ALJ fully supported her determination based on multiple medical opinions and the evidence of record.  Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well.  When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner.  *Jamerson*, 112 F.3d at 1066.

## IX.    No Further Development of Record Was Required

Citing *Penny v. Sullivan*, 2 F.3d 953, 958 (9th Cir. 1993), Plaintiff contends that the ALJ erred in failing to secure an expert opinion concerning her physical impairments.  Because the *Penny* case is distinguishable, Plaintiff's reliance on it is misplaced.

Claimant Penny applied for both disability insurance benefits and supplemental security income.  2 F.3d at 955-56.  Whether Penny could receive disability insurance benefits in addition to SSI depended on whether he could prove disability before June 30, 1987, the last date on which Penny was eligible for disability insurance coverage.  *Id.* at 956.  The Court explained:

> The ALJ devoted almost his entire examination to Penny's pain and disability existing on the date of the hearing, December 7, 1988. Thus the record is confusing as to whether the ALJ properly focused on whether, for purposes of his Title II disability insurance claim, Penny was disabled prior to June 30, 1987. As previously indicated, the ALJ

24

evaluated the entire case based upon the evidence available through the time of his decision of May 17, 1989.

2 F.3d at 956.

The ALJ in the Penny case addressed only evidence related to surgery performed in 1988 and ignored Mr. Penny's testimony concerning his pain before June 30, 1987, before denying benefits based on application of the grids, which are inapplicable to non-exertional limitations such as severe pain. *Id.* at 958. Reasoning that substantial evidence supported Mr. Penny's testimony of severe pain before June 30, 1987, and that the ALJ failed to meet his burden at step five of proving Plaintiff's ability to perform light or sedentary work by relying solely on evidence relevant to the later time period, the Court reversed and remanded for payment of benefits. 2 F.3d at 959. *Penny* did not hold that an ALJ must always secure an expert medical opinion to deny benefits. Because the ALJ in this case was able to evaluate evidence relevant to Plaintiff's physical condition at all relevant times, the situation addressed in *Penny* does not exist here. *See also Schelin v. Colvin*, 2015 WL 566717 at * 9-10 (E.D. Wash. Feb. 11, 2015) (No. CV-14-79-FVS); *Aldrich v. Colvin*, 2014 WL 6653999 at *7 (E.D. Wash. Nov. 24, 2014) (No. 2:13-cv-00401-JTR) (describing *Penny* as a case in which an ALJ erred by relying solely on the opinion of a non-examining physician who reviewed only a portion of the record and did not hear Plaintiff's testimony concerning his pain).

When the case is straightforward, as this case is, the claimant generally bears the burden of proving his or her entitlement to disability benefits. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); 20 C.F.R § 404.1512(c). But Social Security hearings are not adversarial proceedings. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). Whether or not the claimant is represented by counsel, the ALJ "must inform himself about the facts relevant to his decision." *Heckler v. Campbell*, 461 U.S. 458, 471 n. 1 (1983). Nonetheless, an ALJ's obligation to obtain additional evidence is triggered only when the evidence from the treating medical source is inadequate to determine the claimant's disability. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *Tonapetyan*, 242 F.3d at 1150 (holding that ALJs have a duty fully and fairly

to develop the record when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence). When the ALJ finds support in the record adequate to determine the claimant's disability, she is not required to secure an additional or consultative opinion. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

**X.    Conclusion and Order**

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Doreen Ann Burns.

IT IS SO ORDERED.

Dated:   **April 1, 2020**              **/s/ Gary S. Austin**
                                                UNITED STATES MAGISTRATE JUDGE